UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
THEODORE O. WILSON, III,

                           Plaintiff,

              - against -

ADA KELLY SESSOMS-NEWTON, D.I.
JANET HELGESON,

                       Defendants.
------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
14-CV-00106 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Theodore Wilson ("Plaintiff" or "Wilson"), proceeding *pro se*, brought this action

pursuant to 42 U.S.C. § 1983, alleging that Defendants Assistant District Attorney Kelly Sessoms-

Newton ("Sessoms-Newton") and Detective Investigator Janet Helgeson ("Helgeson") unlawfully

entered the property in which Plaintiff lived and that Defendants stole Plaintiff's belongings, in

violation of his Fourth Amendment rights against unreasonable searches and seizures.  Before the

Court is Defendants' motion for summary judgment.  For the reasons stated below, the Court grants

Defendants' motion and dismisses this action in its entirety.

## BACKGROUND

### I.    Relevant Facts[1]

### A.    Plaintiff's Place of Residence

      From February 2010 to October 1, 2011, Plaintiff and his then girlfriend, Mildred Shinsel

("Shinsel"), lived in the first floor apartment of a two-family residential building located at 146-

---

[1] The facts discussed below are taken largely from the Defendants' exhibits because
Plaintiff's Rule 56.1 Counter-Statement is not compliant with local rules.  Specifically, Plaintiff's
56.1 Counter-Statement includes numbering that does not correspond with any paragraphs in
Defendants' 56.1 Statement, and rather than admitting or denying Defendants' statements, Plaintiff
simply lists what appear to be page numbers to exhibits he has not submitted.  *See* November 22,

18 130th Avenue in Jamaica, New York ("130th Avenue building"). (Def. 56.1 ¶¶ 6–7, 17; Aff. of Mildred Shinsel ("Shinsel Aff."), Ex. F, ¶ 1–2; Plaintiff's Dep., Ex. E at 17:14–23.) There was one other apartment in the building on the second floor. (Def. 56.1 ¶ 8; Aff. of Lisa Thomas ("Thomas Aff."), Ex. G, ¶ 2.) There was a common staircase in the building that was not part of either apartment. (Def. 56.1 ¶ 9; Thomas Aff., Ex. G, ¶¶ 3–4.) At all relevant times, Lisa Thomas was the legal owner of the property. (Def. 56.1 ¶ 10; Thomas Aff., Ex. G, ¶ 1; *see also* Thomas's Deed for 146-18 130th Ave., Jamaica, New York, 11436 ("Thomas Deed"), Ex. H.) As of 2009, the property was in foreclosure, and the last legal tenant of the first floor apartment was Karina Jones ("Jones"), who was Shinsel's friend and had vacated the unit in 2009. (Def. 56.1 ¶¶ 11–13; Thomas Aff., Ex. G, ¶¶ 6–9.)

The parties dispute whether Plaintiff had permission to live in the first floor apartment and whether any rent was paid for Plaintiff and Shinsel's occupancy of the apartment. The property owner, Thomas, states that neither Plaintiff nor Shinsel ever obtained permission to enter the premises. (Def. 56.1 ¶ 20; Thomas Aff., Ex. G, ¶ 11.) Thomas, in fact, states that she does not know Plaintiff or Shinsel, that no rental agreement was entered into with either of them, and that she never received any payment from them for the use of the first floor apartment. (Def. 56.1 ¶¶ 19–21; Thomas Aff., Ex. G, ¶ 10–12). In her affidavit, Thomas states that she has not received rent payments from anyone at the property since 2009. (Def. 56.1 ¶ 16; Thomas Aff.,

---

2016 Minute Entry (noting that the last two pages of Dkt. 142-13 are Plaintiff's 56.1 Counter-Statement). Nonetheless, in light of Plaintiff's *pro se* status, the Court considers "Plaintiff's Declaration in Opposition to Defendants' Summary Judgment Motion" (Dkt. 143-13 at ECF 5–8) and "Fourth Declaration of [Plaintiff] in Response to Defendants' Summary Judgment Motion (4/25/16) With Undisputed Facts" (Dkt. 143-11) to be part of Plaintiff's 56.1 Counter-Statement. *See Onitiri v. Security*, No. 12–cv–5425, 2015 WL 13019584, at *1 (E.D.N.Y. Feb. 5, 2015) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)) (noting that courts have discretion to overlook a party's failure to comply with local rules).

Ex. G, ¶ 8.)  Shinsel similarly admits that she and Plaintiff were squatters in the 130th Avenue

building and that they never paid rent or obtained permission from anyone to reside there.  (Def.

56.1 ¶ 17; Shinsel Aff., Ex. F, ¶ 3.)  Rather, Shinsel initially stayed at the first floor apartment for

one to two weeks in late 2009 with her friend Jones.  (Def. 56.1 ¶ 12–14; Mapp Hr'g Tr. ("Mapp

Hr'g"), Ex. J at 9:13–10:3.)  Toward the end of Shinsel's visit, the apartment was rendered

uninhabitable by water damage, and Jones moved out, leaving the apartment vacant.  (Def. 56.1 ¶

47; Mapp Hr'g, Ex. J at 9:24-10:10.)  Shinsel and Plaintiff moved in shortly thereafter.  (Def.

56.1 ¶ 17; Shinsel Aff., Ex. F, ¶¶ 2–3.)  According to Shinsel, she and Plaintiff obtained a blank

lease template to create a fake lease for the first floor apartment.  (Det. 56.1 ¶¶ 23–25; Shinsel

Aff., Ex. F, ¶¶ 4–5.)

　　　　In contrast to Shinsel's and Thomas' assertions, Plaintiff claims that "an associate of Ms.

Thomas" gave him keys to the property, that a lease was signed, and that he and the associate

agreed upon a monthly rent of $600.  (March 4, 2013 Hr'g Tr. ("Suppression Hr'g."), Ex. L at

49:18–50:1.)  Plaintiff alleges that he paid rent for eighteen of the twenty months he lived in the

apartment.  (*Id.* at 50:15–17.)[2]  Plaintiff and Shinsel's occupancy of the first floor apartment

ended on October 1, 2011, when Plaintiff was arrested on suspicion of assaulting Shinsel.  (Def.

56.1 ¶ 27; Arrest Report, Ex. M.)

---

[2] Plaintiff testified at his criminal proceeding that he signed a lease with "an associate of Ms. Thomas, named Michael Thomas," and that he had paid rent.  (Suppression Hr.'g, Ex. L at 49:18–50:1.)  Despite testifying that he had paid rent for eighteen of the twenty months he lived in the apartment, and that he had receipts for his rent payments, Plaintiff never produced any documents supporting these statements.  (*Id.* at 50:15–19.)

**B.    Prosecution of Plaintiff**

It is undisputed that during the course of Plaintiff's criminal prosecution, Defendants entered the 130th Avenue building without a warrant on two separate occasions, and that on one of these occasions, they entered the first floor apartment.

        1.    <u>October 2001 Search</u>

On October 21, 2011, Sessoms-Newton, who was assigned to prosecute the case against Plaintiff, and Helgeson visited the 130th Avenue building to canvas the area and search for a possible witness who might have information about Shinsel's injuries.  (Def. 56.1 ¶ 48; Decl. of Sessoms-Newton ("Sessoms-Newton Decl."), Ex. I, ¶ 13.)  Prior to visiting the building, Sessoms-Newton visited the hospital, where Shinsel remained unresponsive, and learned that Shinsel's mother, Judith Workman ("Workman"), had the authority to make medical decisions on Shinsel's behalf.  (Sessoms-Newton Decl., Ex. I, ¶¶ 2–3; Shinsel Aff., Ex. F, ¶¶ 6, 9; Aff. of Judith Workman ("Workman Aff."), Ex. O, ¶ 10.)  After further communicating with hospital staff, as well as with Workman, Sessoms-Newton concluded that Workman considered herself to be responsible for all decisions made on behalf of Shinsel.  (Def. 56.1 ¶ 42; Sessoms-Newton Decl., Ex I, ¶ 7.)  Over the phone, Workman asked Sessoms-Newton to retrieve some of Shinsel's personal belongings from the apartment.  (Def. 56.1 ¶ 41; Workman Aff., Ex. O, ¶ 5.)  Before October 21, 2011, Sessoms-Newton also spoke to Jones, who informed Sessoms-Newton that the first floor apartment at the 130th Avenue building had been rendered uninhabitable due to water damage and that Plaintiff and Shinsel were not legal residents of the apartment.  (Def. 56.1 ¶ 46–47; Sessoms-Newton Decl, Ex. I, ¶¶ 10–11.)

When Defendants arrived at the 130th Avenue building, they noted the unkempt nature of the curtilage and the mail slot bursting with unopened envelopes.  (Def. 56.1 ¶ 50–51; Sessoms-Newton Decl., Ex. I, ¶¶ 15–16.)  They also noticed the front door partially unhinged and unlocked.

(Def. 56.1 ¶ 54–55). When no one answered their knocks, Defendants entered the building. (Def. 56.1 ¶ 53, 55; Sessoms-Newton Decl., Ex. I, ¶17.) They made their way to the second floor to look for a witness. (Def. 56.1 ¶ 56; Sessoms-Newton Decl., Ex. I, ¶ 17.) Following a brief survey of the second floor apartment, which was empty but for a few items strewn across the floor, they went downstairs to the first floor apartment. (Def. 56.1 ¶ 56–59; Sessoms-Newton Decl., Ex. I, ¶ 18.) Upon finding the first floor apartment similarly unlocked, and after no one answered their knocks, they entered the apartment. (Def. 56.1 ¶ 60–61; Mapp Hr'g, Ex. J at 14:22–15:3; Sessoms-Newton Decl., Ex. I, ¶ 21.) Defendants noticed furniture, grocery bags, and clothes in the apartment. (Def. 56.1 ¶ 62; Mapp Hr'g, Ex. J at 15:4–9.) Because Sessoms-Newton had previously been informed of Plaintiff's allegation that Shinsel injured herself by banging her head against the wall, Sessoms-Newton took three photographs of the apartment wall as evidence. (Def. 56.1 ¶ 65; Sessoms-Newton Decl., Ex. I, ¶ 22.)

2.    November 2011 Search

Shortly after the October 2011 search, Plaintiff was indicted by a grand jury. (Grand Jury Indictment, Ex. Q.) Plaintiff testified in the grand jury that Shinsel had fallen down the stairs in the common stairwell of the building. (Trial Tr., *People v. Theodore Wilson*, Dec. 12, 2013, Ex. P at 688:12–688:25.) On November 23, 2011, Sessoms-Newton, who heard the testimony, again visited the 130th Avenue building with Helgeson to collect evidence and search for a potential witness who may have known Shinsel. (Def. 56.1 ¶¶ 70–71; Sessoms-Newton Decl., Ex. I, ¶ 26.) Once there, they again entered through the unlocked front door of the building and then took several photographs of the stairwell. (Def. 56.1 ¶ 72–73; Sessoms-Newton Decl., Ex. I, ¶ 27.) This time, they did not enter either of the apartments. (Sessoms-Newton Decl., Ex. I, ¶ 28.)

3. <u>March 2013 Suppression Hearing</u>

During the subsequent criminal proceedings, the Honorable Joseph Zayas of the New York Supreme Court found that Plaintiff had an expectation of privacy in the first floor apartment because Plaintiff "treated . . . the apartment[] as his own," and there was no indication that Thomas had any objection to Plaintiff's use of the property; still, the court did not credit Plaintiff's testimony that a lease agreement had been entered into and that Plaintiff had paid rent. (Suppression Hr.'g, Ex. L at 51:14–22, 52:18–19.)  Accordingly, Judge Zayas granted Plaintiff's motion to suppress the photographs taken on October 21, 2011.  (Def. 56.1 ¶ 76; Suppression Hr.'g, Ex. L at 52:18–53:6.)  However, the court denied the motion as to the photographs taken of the common stairwell in November 2011.  (Def. 56.1 ¶ 76; Suppression Hr.'g, Ex. L at 53:7–53:19.)  Even though the prosecution was not allowed to introduce into evidence photographs of the first floor apartment wall, Plaintiff was ultimately convicted of assault in the first degree and assault in the second degree.  (Def. 56.1 ¶ 78; Certificate of Disposition, Ex. R.)

## II.    Procedural History

Plaintiff filed the  Complaint in this action on January 2, 2014.  (Dkt. 1.)  On February 11, 2014, Plaintiff filed an amended complaint.  (Dkt. 6.)  On March 26, 2014, the Honorable John Gleeson ordered that the Amended Complaint would proceed against Sessoms-Newton and Helgeson solely as to two of Plaintiff's claims:  (1) unlawful entry, relating to Defendants' warrantless entries into the 130th Avenue building in October and November 2011; and (2) deprivation of personal property, relating to Plaintiff's claim that Defendants took a camera and two cell phones from the first floor apartment.  (*See* Dkt. 9.)  On April 25, 2016, Defendants served Plaintiff with their motion for summary judgment.  (Dkt. 118.)  Because Plaintiff claimed that the first copy of the motion was destroyed by prison officials, Defendants served a second copy of the motion on May 9, 2016.  (*See* May 6, 2016 order, Dkt. 120.)  After granting several extension

requests from Plaintiff, the Court ordered Plaintiff to file his opposition papers by August 1, 2016; Plaintiff did not comply with that order. (*See* June 8, 2016 order.) On August 25, 2016, the briefing schedule was adjourned to ensure that Defendants received Plaintiff's opposition papers. (*See* August 25, 2016 order.) Around September 15, 2016, Defendants received approximately thirteen separate packets of documents from Plaintiff. (*See* Dkt. 143.) On November 22, 2016, at Defendants' request, the Court conducted a status conference to clarify the scope of Plaintiff's opposition papers because Plaintiff had sent Defendants approximately 160 pages of single-spaced documents. (*Id.*) At the conference, Plaintiff confirmed that his July 17 and 18, 2017 submissions to the Court (Dkts. 127, 128) and all 160-pages of documents he had sent Defendants (Dkt. 143) represented the entirety of his opposition. (*See* November 22, 2016 order). Defendants' summary judgment motion was fully briefed on January 30, 2017.[3] (Dkt. 151.)

## DISCUSSION

### I.     Summary Judgment Standard

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013) (quoting *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001)); *see also* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "Material" facts are facts that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the

---

[3] Plaintiff continued to submit exhibits and another document entitled memorandum in opposition to Defendants' summary judgment motion after January 30, 2017. (*See* Dkts. 158–163.) The Court has not considered Plaintiff's belated submissions, which are either irrelevant or duplicative of his earlier submissions, in deciding Defendants' motion.

nonmoving party." *Id.* "The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 322). Once a defendant has met his initial burden, the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 323–24 (internal quotation marks omitted). In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation and internal quotation marks omitted).

The Court's inquiry upon summary judgment is "determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (alterations in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"When a *pro se* litigant is involved, although the same standards for summary judgment apply, the *pro se* litigant 'should be given special latitude in responding to a summary judgment motion.'" *Laster v. Mancini*, No. 07–cv–8268, 2013 WL 5405468, at *2 (S.D.N.Y. Sept. 25, 2013) (quoting *Gonzalez v. Long*, 889 F. Supp. 639 (E.D.N.Y. 1995)). "Nevertheless, a *pro se* litigant cannot rely solely upon the pleadings[] or conclusory allegations or unsubstantiated speculation to defeat summary judgment." *Cole v. Rogers*, No. 14–cv–3216, 2017 WL 1157182, at *6 (E.D.N.Y. Mar. 6, 2017) (citation and internal quotation marks omitted), *report and recommendation* adopted, 2017 WL 1155002 (E.D.N.Y. Mar. 27, 2017).

## II. Plaintiff's Unlawful Entry Claim

Plaintiff alleges that Defendants' warrantless entries into the first floor apartment and the common stairwell area of the 130th Avenue building, and the photographing of these premises, violated his Fourth Amendment rights. Defendants respond that Plaintiff's unlawful entry claim fails as a matter of law because (1) Plaintiff, as a squatter, did not have a reasonable expectation of privacy in the building; and (2) he did not have a reasonable expectation of privacy in the common stairwell of the apartment building, which was a multi-family dwelling.[4]

### A. Legal Standards

The Fourth Amendment to the United States Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV; *see also Southerland v. City of N.Y.*, 680 F.3d 127, 132 n.1 (2d Cir. 2012) (citing, *inter alia*, *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)) (noting that the Fourth Amendment's search and seizure provisions are applicable to the States through the Fourteenth Amendment's Due Process Clause). "The Fourth Amendment's warrant requirement protects one's privacy interest in home or property. Absent exigent circumstances or some other exception, [State actors] must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy. " *U.S. v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000). At

---

[4] Because Plaintiff's unlawful entry claim is dismissed based on the finding that Plaintiff, as a squatter, did not have a reasonable expectation of privacy in any part of the building in which he lived and that Defendants are entitled to qualified immunity, the Court does not address Defendants' third argument that their entries into the property were based on consent from Shinsel's mother, who allegedly had apparent authority to give consent.

the same time, the Supreme Court has "uniformly [ ] held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *El-Nahal v. Yassky*, 835 F.3d 248, 253 n.2 (2d Cir. 2016) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)); *see also Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)); *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (noting that the "cornerstone of the modern law of searches is the principle that, to mount a successful Fourth Amendment challenge, 'a defendant must demonstrate that he personally has *an expectation of privacy in the place searched*'" (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998))).[5]

"Thus, a Fourth Amendment search[] . . . does not occur unless the search invades an object or area [in which] one has a subjective expectation of privacy that society is prepared to accept as objectively reasonable." *United States v. Ulbricht*, 858 F.3d 71, 96 (2d Cir. 2017) (quoting *United States v. Hayes*, 551 F.3d 138, 143 (2d Cir. 2008) (internal quotation marks omitted)); *see also Kyllo v. United States*, 533 U.S. 27, 33 (2011); *Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment." (internal quotation marks omitted)). In other words, a plaintiff challenging a search must demonstrate not only his subjective expectation of privacy in the place searched, but also that his expectation was objectively reasonable. *Ulbricht*, 858 F.3d at 96.

---

[5] *See also Minnesota v. Carter*, 525 U.S. at 88 ("[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)); *Illinois v. Andreas*, 463 U.S. 765, 771 (1983) ("The Fourth Amendment protects legitimate expectations of privacy rather than simply places. If the inspection . . . does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause."); *United States v. Gray*, 283 F. App'x 871, 872 (2d Cir. 2008) (summary order) (citing *Illinois v. Andreas*).

## B.   Plaintiff as a Trespasser Did not Have an Objectively Reasonable Expectation of Privacy in Any Part of the Areas Defendants Entered

By explicitly stating that "a mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully,"[6] *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980), the Second Circuit indicated that an unlawful occupant's subjective expectation of privacy is not one that "society is prepared to accept as objectively reasonable," *see Ulbricht*, 858 F.3d at 96 (quoting *United States v. Hayes*, 551 F.3d at 143).[7]  *See, e.g.*, *Sanchez*, 635 F.2d at 64 (affirming district

---

[6] Under New York law, "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises." *Zaniewska v. City of N.Y.*, 569 F. App'x 39, 42 (2d Cir. 2014) (summary order) (quoting N.Y. Penal Law § 140.05).

[7] In the absence of Supreme Court precedent regarding a trespasser's Fourth Amendment rights against unreasonable searches, courts have developed different theories of trespassers' privacy expectations and Fourth Amendment rights.  Some circuit courts have held that trespassers and squatters cannot have a reasonable expectation of privacy in the property they wrongfully occupy.  *See, e.g.*, *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11 (1st Cir. 1975) (holding that squatters on government property do not have a reasonable expectation of privacy on that property because they can be immediately evicted); *United States v. Ruckman*, 806 F.2d 1471, 1471 (10th Cir. 1986) (trespasser had no legitimate expectation of privacy in a cave in which he resided on federal land); *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005) (collecting cases in which courts have concluded that those "who inhabit a residence wrongfully may not claim a legitimate expectation of privacy in the property"); *United States v. Murray*, No. 1:10-cr-00024, 2010 WL 3069485, at *6 (D.V.I. Aug. 2, 2010) (noting that "virtually every court . . . has found that a squatter lacks standing to contest a search of the structure in which he or she is squatting" (collecting cases)).  The Ninth Circuit, in contrast, has recognized trespassers' legitimate expectation of privacy so long as the trespassers have not been warned of their unlawful tenancy.  *See United States v. Sandoval*, 200 F.3d 659, 660–61 (9th Cir. 2000) (holding that an unwarned trespasser maintained a legitimate expectation of privacy in a tent-like structure on unmarked federal government land); *see also State v. Dias*, 609 P.2d 637, 639–40 (Haw. 1980) (holding that squatters on State government land had a legitimate expectation of privacy in structure built on the land because the government "acquiesced" its right to eject the squatters and the squatters had used the land by sufferance of the State for a "considerable period of time").

In *Sanchez*, the Second Circuit joined the jurisdictions that employ the *Amezquita-Ruckman* approach.  635 F.2d at 64 ("[A] mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully . . . .").  Consequently, courts in this jurisdiction do not recognize a trespasser's subjective expectation of privacy in a premises he or she unlawfully occupies to be objectively reasonable.  *See, e.g.*, *Gill*, 2017 WL 1097080, at *6 (noting that "squatters' claims under Section 1983 are routinely rejected by courts in the Second circuit" (collecting cases)); *Walls v. Giuliani*, 916 F. Supp. 214, 221 (E.D.N.Y. 1996) ("Under [*Rakas v. Illinois*], a trespasser

---

court's denial of a criminal defendant's motion to suppress evidence obtained from searching a car where defendant demonstrated neither ownership of the car, nor license from the owner to possess the car). "The [Supreme Court] in [*Jones v. United States*, 362 U.S. 257 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83, 100 (1980),] was quite careful to note that 'wrongful' presence at the scene of a search would not enable [an individual] to object to the legality of the search." *Sanchez*, 635 F.3d at 64 (quoting *Rakas v. Illinois*, 439 U.S. 128, 141 n.9 (1978)); *see also*, *Gill v. City of N.Y.*, No. 15-CV-5513, 2017 WL 1097080, at *5–6 (E.D.N.Y. Mar. 23, 2017) (finding that plaintiff lacked standing to object to police entry of the apartment where plaintiff was an unlawful tenant and noting that "squatters' claims under Section 1983 are routinely rejected by courts in this circuit" (collecting cases)); *United States v. Rounds*, No. 10-CR-239S, 2015 WL 5156872, at *5–6 (W.D.N.Y. Sept. 2, 2015) ("Unlawful occupation of property runs contrary to societal standards of reasonableness." (collecting cases)); *United States v. Shelton*, No. 14-cr-6009, 2015 WL 500886, at *3 (W.D.N.Y. Feb. 5, 2015) (unwelcomed boyfriend who broke into the home of the leaseholder had no reasonable expectation of privacy in the residence); *Lagasse v. City of Waterbury*, No. 3:09-cv-391, 2011 WL 2709749, at *9–10 (D. Conn. July 12, 2011) (dismissing plaintiff's unlawful entry claim, because, as a trespasser, plaintiff did not have a reasonable expectation of privacy (citing *Sanchez*)); *United States v. Diaz*, 675 F.

---

obviously cannot claim any reasonable expectation of privacy in premises he is unlawfully occupying."); *De Villar v. City of N.Y.*, 628 F. Supp. 80, 83 (S.D.N.Y. 1986) (finding that plaintiffs, for purposes of a Section 1983 action, "had no more of a property interest in those apartments than in any other in the [c]ity they might have trespassed into and encamped within, that is, none at all," where plaintiffs entered the building illegally after it was placed in a consolidation program and did not pay any rent to the city); *accord United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) ("[W]hen a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room or in any articles therein of which the hotel lawfully takes possession." (collecting cases)). As these cases make clear, trespass for purposes of Fourth Amendment analysis encompasses occupancy of a premises that might otherwise qualify as "adverse possession" under State common law.

Supp. 1382, 1387 (E.D.N.Y. 1987) (denying a motion to suppress evidence seized from searching a car where the car was registered to a third party and defendant did not show "a legitimate basis— such as the owner's permission—for being in it").

The Second Circuit has explained that infringement of one's legitimate expectation of privacy can be demonstrated "by showing that he owns the premises or property subjected to search, or by showing that he occupies and has dominion and control over the premises or property *by leave of the owner*." *Sanchez*, 635 F.2d at 63–64 (emphasis added) (citing *Rakas*, 439 U.S. at 143 n.12 and *Jones*, 362 U.S. at 267). Here, nothing in the summary judgment record indicates that Plaintiff owned the first floor apartment or that he occupied the unit by leave of the owner, Thomas. Uncontested evidence in the record demonstrates that Thomas was the legal owner of the apartment building when Defendants lived in the first floor unit. (Def. 56.1 ¶ 10; Thomas Aff., Ex. G, ¶ 1; Thomas Deed, Ex. H.) Moreover, Thomas has stated that Plaintiff and Shinsel never entered into a rental agreement with her. (Def. 56.1 ¶¶ 16–21; Thomas Aff., Ex. G, ¶11 (stating that neither Plaintiff nor Shinsel ever entered into any rental agreement with Thomas).) Thomas has also sworn that she has not received any rent payments from anyone at the 130th Avenue building since 2009, when Jones vacated the building. (Thomas Aff., Ex. G, ¶¶ 8–9.) Notably, Shinsel herself admits that she and Plaintiff lived in Thomas' apartment building as squatters, that she and Plaintiff never paid rent or obtained permission from anyone to reside there, and that they used a "blank lease template to create a fake lease" listing themselves as tenants. (Def. 56.1 ¶¶ 6, 23–25; Shinsel Aff., Ex. F, ¶¶ 2–5.)

While Plaintiff insists that he was given permission to live in Thomas' building, that he signed a rental lease, and that he had paid rent, Plaintiff has not produced any evidence in support of his claims. At his previous criminal proceedings, Plaintiff asserted—without any corroborating

evidence—that a signed lease existed and that he had receipts for eighteen months of rent payments to Thomas. (*See* Suppression Hr.'g, Ex. L at 49:18–20, 50:15–17.) Four years later, Plaintiff still has not produced any supporting evidence for such assertions. Plaintiff cannot create a dispute of material fact by relying only on his allegations. Even a *pro se* litigant must provide more than conclusory allegations to defeat summary judgment. *See Cole*, 2017 WL 1157182, at *6; *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 (noting that a nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts . . . ."). Based on the record evidence, no reasonable jury could find that Plaintiff was a legal tenant with an objectively reasonable expectation of privacy. Here, the evidence presented is "so one-sided" that Defendants must prevail as a matter of law. *See Anderson*, 477 U.S. at 251–52 ("In essence [ ], the inquiry [at the summary judgment stage is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."); *see also Sanchez*, 635 F.2d at 64 ("[W]e have held that where a defendant had the keys to a car and permission from the owner to use it[,] he had standing to challenge the search of the car; but where the car driven by one defendant with the other defendant as a passenger was registered in someone else's name, and neither defendant showed any legitimate basis for being in the car, neither had standing." (citations omitted)). In sum, because Plaintiff, as a trespasser, did not have an objectively reasonable expectation of privacy, the Court dismisses his unlawful entry claim.[8]

---

[8] The Court need not delve into whether Plaintiff had a subjective expectation of privacy in the property in which he lived—an issue that does not seem to be in dispute, in any case—given that Plaintiff did not have an objectively reasonable expectation of privacy. *See United States v. Zodhiates*, 166 F. Supp. 3d 328, 336 (W.D.N.Y. 2016) ("[N]o Fourth Amendment 'search' occurred, even if the defendant otherwise demonstrated his subjective expectation of privacy . . . ."); *United States v. Santopietro*, 809 F. Supp. 1001, 1007 (D. Conn. 1992) ("Assuming, *arguendo*, that the defendant [ ] exhibited a subjective expectation of privacy, the Court simply cannot

### C. Plaintiff Did Not Have an Objectively Reasonable Expectation of Privacy in the Common Stairwell

Moreover, Plaintiff's contention that Defendants' entries into the building and specifically the common stairwell constituted "unreasonable searches" is meritless. The Second Circuit has held that "a person does not have a reasonable expectation of privacy in the common areas of multi-unit buildings." *United States v. Simmonds*, 641 F. App'x 99, 104 (2d Cir. 2016) (summary order); *see also United States v. Gray*, 283 F. App'x 871, 873 (2d Cir. 2008) (summary order) (finding that defendant "did not have a privacy interest in the hallway because it was not subject to his exclusive control. The record indicates that [plaintiff] and his neighbor shared the hallway . . . ."); *United States v. Holland*, 755 F.2d 253, 255–56 (2d Cir. 1985) (finding arrest in common hallway of two-story apartment building did not occur in defendant's "zone of privacy"); *Watkins v. Ruscitto*, No. 14–cv–7504, 2016 WL 3748498, at *9 (S.D.N.Y. July 11, 2016) (finding that plaintiff did not have a legitimate expectation of privacy in a bathroom in a common hallway in a Section 1983 suit). The building in which Plaintiff lived had two apartment units, and the staircase, of which Defendants took photos, was a common staircase within the building. (Thomas Aff., Ex. G, ¶¶ 2–4.) Therefore, Plaintiff's unlawful entry claim based on Defendants' entry into the common stairwell is dismissed.

### III. Collateral Estoppel

Defendants contend that Plaintiff cannot invoke offensive collateral estoppel based on the State court decision to suppress the photographs taken of the first floor apartment,[9] because

---

conclude that his expectation is one that society is prepared to recognize as reasonable . . . ." (citation and internal quotation marks omitted)).

[9] Although Plaintiff did not raise the issue of offensive collateral estoppel in his opposition to Defendants' summary judgment motion, the Court considers this issue because it is plainly implicated by the circumstances of this case.

Defendants did not have the requisite "full and fair opportunity to litigate" this issue. The Court agrees.

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002); *see also Jenkins v. City of N.Y.*, 478 F.3d 76, 85 (2d Cir. 2007) (citing *Juan C. v. Cortines*, 89 N.Y.2d 659, 667 (N.Y. 1997)). Under 28 U.S.C. § 1738, "issues actually litigated in a state-court proceeding are entitled to the same preclusive effect in a subsequent federal § 1983 suit as they enjoy in the courts of the State where the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 83 (1984) (discussing *Allen v. McCurry*, 449 U.S. 90 (1980)); *Routier v. O'Hara*, No. 08–cv–2666, 2013 WL 3777100, at *7 (E.D.N.Y. July 17, 2013) (same).

"Under New York law, collateral estoppel will preclude a federal court from deciding an issue if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Reddy v. Catone*, 630 F. App'x. 120, 121 (2d Cir. 2015) (summary order) (quoting *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007)); *see also Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003) ("[C]ollateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication." (citation and internal quotation marks omitted)). "The party seeking the benefit of collateral estoppel has the burden of demonstrating the identity of the issues[,] . . . whereas the party attempting to defeat its application has the burden of establishing the absence of a full and fair opportunity to litigate the issues." *Constantine v. Teachers College*, 448 F. App'x. 92, 93 (2d Cir. 2011) (summary order) (quoting *Evans v. Ottimo*, 469 F.3d 278, 281–82 (2d Cir. 2006)).

However, "collateral estoppel will not bar reconsideration of an issue if there is an inability to obtain review or there has been no review, even though an appeal was taken." *Jenkins*, 478 F.3d at 91 (quoting *Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996)). In other words, "[i]f a party has not had the opportunity to appeal an adverse finding, then it has not had a full and fair opportunity to litigate that issue." *Id.* (citation and quotation marks omitted); *id.* ("If review is unavailable because the party who lost on the issue obtained a judgment in his favor, the general rule of [collateral estoppel] is inapplicable by its own terms." (quoting Restatement (Second) of Judgments § 28(1) cmt. a (1982)); *see also Johnson*, 101 F.3d at 796 (finding application of the doctrine of collateral estoppel in subsequent federal Section 1983 case was in error because "[b]efore the jury's verdict, any appeal of the State court's ruling of probable cause would have been premature[;] [a]fter final judgment [of acquittal] was entered[,] that issue was moot[;] [t]hus, [the criminal defendant] had neither the opportunity nor the incentive to appeal the adverse finding of probable cause to arrest him"); *see also People v. Medina,* 617 N.Y.S.2d 491, 493 (N.Y. App. Div. 1994) ("The People did not have a full and fair opportunity to litigate the suppression order . . . because they had no opportunity to appeal the erroneous decision"); *Bland v. N.Y.*, 263 F. Supp. 2d 526, 552 (E.D.N.Y. 2003) ("A determination whether the first action or proceeding genuinely provided a full and fair opportunity requires consideration of . . . , [*inter alia,*] the *incentive* and initiative to litigate and the actual extent of litigation . . . ." (emphasis added)).

Here, Plaintiff was ultimately convicted in the criminal case—even though the prosecution was prohibited from introducing the photographs taken of the first floor apartment—and thus Defendants had neither the incentive nor the opportunity to appeal the State court's finding that Plaintiff had an expectation of privacy in the first floor apartment. *See Jenkins*, 478 F.3d at 92 (finding that "facts determined in a pretrial suppression hearing cannot be given preclusive effect

against a defendant subsequently acquitted of the charges," because that defendant lacked the opportunity and reason to seek appellate review of the determination); *see also Medina*, 617 N.Y.S.2d at 493.[10] "In New York, the danger inherent in the doctrine of collateral estoppel—that an erroneous first decision on an issue will be perpetuated in subsequent litigation—is remedied to an extent by the requirement that the doctrine not be applied when there is no opportunity for appellate review." *Jenkins*, 478 F.3d at 91; *Johnson*, 101 F.3d at 795 ("Under New York Law, appellate review plays a critical role in safeguarding the correctness of judgments . . . .").

In finding that Defendants did not have the opportunity to appeal the State court's suppression finding, the Court has taken into account the theoretical possibility that the prosecutors in Plaintiff's criminal case could have sought interlocutory appeal of the suppression order and that "[w]here [appellate] review is available but is not sought, estoppel applies." *Pinkey v. Keane*, 920 F.2d 1090, 1097 (2d Cir. 1990) (citing Restatement (Second) of Judgment § 28(1) cmt. a). Indeed, in *Pinkey*, the Second Circuit explained that, "while lack of incentive to litigate vigorously may render the collateral estoppel doctrine inoperative, lack of incentive to appeal does not have the same effect. Rather, failure to appeal an adverse judgment negates the preclusive effect of that judgment only when review was unobtainable 'as a matter of law.'" *Id.* at 1097 (citations omitted).

---

[10] Generally, it is more common for courts to find that a State court's ruling against a criminal defendant in a previous criminal proceeding does not subject that defendant to defensive collateral estoppel when he is acquitted and then pursues a Section 1983 suit. *See, e.g.*, *Johnson*, 101 F.3d at 795 ("[I]n the acquittal context, New York courts have held that facts determined in a pretrial suppression hearing cannot be given preclusive effect against a defendant subsequently acquitted of the charges."). Here, the Court considers whether Plaintiff can assert "offensive collateral estoppel" based on the favorable ruling he received as a defendant in his State court criminal matter. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 n.4 (1979) ("[O]ffensive use of collateral estoppel occurs when the plaintiff seeks to foreclose defendant from litigating an issue defendant has previously litigated unsuccessfully in an action with another party.").

Here, the prosecutors in Plaintiff's criminal case did not have a real opportunity to appeal the suppression order. Although New York Criminal Procedure Law ("CPL") § 450.50 provides that the prosecution may pursue an interlocutory appeal challenging an order granting a criminal defendant's suppression, that appeal right is limited. In order to seek such an appeal, the prosecution must "file a statement asserting that they cannot prevail at trial without such evidence." *Yarter v. Winn*, 645 N.Y.S.2d 333, 334 (N.Y. App. Div. 1996) (citing N.Y. CPL §§ 450.20(8) and 450.50(1)); *see, e.g.*, *People v. Howington*, 946 N.Y.S.2d 368 (N.Y. App. Div. 2012); *see* N.Y. CPL § 450.50 (requiring prosecution to file "statement asserting that the deprivation of the use of the evidence ordered suppressed has rendered the sum of the proof available to the people with respect to a criminal charge which has been filed in the court either (a) insufficient as a matter of law, or (b) so weak in its entirety that any reasonable possibility of prosecuting such charge to a conviction has been effectively destroyed."); *People v. McIntosh*, 600 N.E.2d 199, 200 (N.Y. 1992) (noting that the "purpose of [§ 450.50(1)] is to limit appeals by the People from suppression orders to cases in which the order is so devastating to the People's case that, as a practical matter, it ends the prosecution"); *see also* N.Y. CPL § 450.20(8). Moreover, "[i]n the event that the appeal is unsuccessful, the taking of the appeal bars further prosecution of the indictment (*see*, [N.Y.] CPL 450.50(2))." *Yarter*, 645 N.Y.S.2d at 334. In Plaintiff's criminal case, seeking interlocutory appeal of the State court's suppression order was not a viable option because the suppressed evidence, *i.e.*, photographs of the walls of the first floor apartment, were not necessary to the prosecution's case, and thus the government could not have filed, in good faith, the statement required by § 450.50(1). Furthermore, because Sessoms-Newton ultimately recused herself from prosecuting the case after having to testify as a witness in Plaintiff's criminal proceeding (Def. 56.1 ¶ 77), Sessoms-Newton *herself* was unable to appeal the decision suppressing the photographs

she took of the first floor apartment building. Similarly, Hegelson, an investigator, had no authority or opportunity to appeal the suppression order.[11]

For the foregoing reasons, the Court finds that Defendants are not collaterally estopped from litigating whether Plaintiff had an objectively reasonable expectation of privacy in the first floor apartment and the common areas of the 130th Avenue building.

## IV.    Qualified Immunity

Even if Defendants violated Plaintiff's Fourth Amendment constitutional rights, they are entitled to qualified immunity because the law is not clearly established as to a trespasser's right to be free from a search of the premises where they are residing unlawfully.

Qualified immunity protects government officials from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

---

[11] On a related note, before Plaintiff could successfully assert offensive collateral estoppel against Defendants, he must show that the People of the State of New York, as represented by the New York District Attorney's office, are in privity with both Defendants in the instant action. It is unlikely that there is privity between Defendants and the People of the State of New York when neither Sessoms-Newton nor Hegelson had the requisite control required over the criminal proceedings or had control over the presentation of evidence. *See Jenkins*, 478 F.3d at 85 (finding application of collateral estoppel doctrine inappropriate in a Section 1983 suit because the detectives who investigated plaintiff's criminal case and also testified as witnesses were not in privity with the People of the State of New York, the prosecuting party, and were "not parties to [the plaintiff's] criminal proceeding"); *see also Amalfitano v. Rosenberg*, No. 04–cv–2027, 2005 WL 2030313, at *3 (S.D.N.Y. Aug. 22, 2005) (noting relevant factors in determining whether privity exists for purposes of collateral estoppel, including the extent to which the party against whom preclusion is asserted "exercised some degree of actual control over the presentation") (quoting *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 185 (2d Cir. 2003) and *Buechel v. Bain*, 97 N.Y.2d 295, 301, 766 N.E.2d 914 (N.Y. 2001)); *see also Stancuna v. Sherman*, 563 F. Supp. 2d 349, 353–54 (D. Conn. 2008) ("Although the Second Circuit does not appear to have expressly so held, a number of other circuits have held that government employees in their individual capacities are not in privity with their government employer." (collecting cases)); *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 243–44 (N.D.N.Y. 2008) (declining to find privity where plaintiff did not have the ability to control the presentation of evidence or appeal the final decision in the prior proceedings).

person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) (citations omitted); *Coggins v. Buonora*, 776 F.3d 108, 114 (2d Cir. 2015) (same). In deciding whether qualified immunity applies, courts conduct a two-step analysis: "First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? Second, if there was a constitutional violation, was the right clearly established at the time of the officer's actions?" *Barboza v. D'Agata*, 676 F. App'x 9, 12 (2d Cir. 2017) (summary order); *see Winfield v. Trottier*, 710 F.3d 49 (2d Cir. 2013) (when deciding the issue of qualified immunity, "courts ask whether the facts shown [1] 'make out a violation of a constitutional right,' and [2] 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" (quoting *Pearson*, 555 U.S. at 232)). Courts, however, "may, in [their] own discretion, refrain from determining whether a constitutional right has been violated and instead move directly to the question of qualified immunity . . . ." *Costello v. City of Burlington*, 632 F.3d 41, 51–52 (2d Cir. 2011) (Pooler, J., concurring).

To determine whether the relevant law was clearly established, a court considers "the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable [State actor] in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014), *cert. denied sub nom. Torresso v. Terebesi*, 135 S. Ct. 1842 (2015); *see also Southerland v. City of N.Y.*, 681 F.3d 122, 125 (2d Cir. 2012) (Mem) ("[T]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [State actor] that his conduct was unlawful in the situation

he confronted." (citation and internal quotation marks omitted)). "In a damages action asserting an illegal search, 'the relevant question . . . is . . . whether a reasonable [State actor] could have believed [the] search to be lawful, in light of clearly established law and the information the searching [State actor] possessed." *Moore v. Vega*, 371 F.3d 110, 115 (2d Cir. 2004) (second alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "A[] [State actor] conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Pearson*, 555 U.S. at 243–44.

As discussed *supra*, there is no law clearly establishing that a warrantless search of a premises occupied by a trespasser violates the Fourth Amendment. If anything, the Second Circuit has found that trespassers and squatters have no constitutionally protected property interests with respect to the places where they reside and thus have no Fourth Amendment protection as to those premises. *See Sanchez*, 635 F.2d at 64 ("[A] mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully . . . ."); *accord Smith v. Cnty. of Nassau*, No. 10–cv–4874, 2015 WL 1507767, at *8 (E.D.N.Y. Mar. 31, 2015) ("To the extent that Plaintiff was a squatter, he had no legal right to remain on the Property, and therefore cannot assert a cognizable property interest in the continued occupancy of the Property."), *aff'd*, 643 F. App'x 28 (2d Cir. 2016).

Moreover, prior to entering the 130th Avenue building, Sessoms-Newton found out from Jones, who was Shinsel's friend, that Plaintiff and Shinsel were not legal residents of the first floor apartment, and that the first floor apartment had been rendered uninhabitable by water damage. (*See* Def. 56.1 ¶¶ 45–47; Sessoms-Newton Decl., Ex. I, ¶¶ 9–11.) Both times, when Defendants went to the 130th Avenue building, they noticed that the building and surrounding area appeared to be unkempt and abandoned, with all of the doors unlocked, unhinged, or ajar. (Def. 56.1 ¶¶ 48, 50–51, 54–55, 57, 61.) The front door mail slot was also filled with unopened envelopes and

solicitation flyers. (Def. 56.1 ¶ 51; Sessoms-Newton Decl., Ex. I, ¶ 16.) When Sessoms-Newton knocked on the partially unhinged and unlocked front building door, there was no answer. (Def. 56.1 ¶ 53.) Both the first and second floor apartment doors were unlocked, and no one responded to Defendants' knocking. (Def. 56.1 ¶¶ 56–57, 60–61.) Even though the first floor apartment appeared to be inhabited (Def. 56.1 ¶¶ 62), given the lack of clearly established law regarding the Fourth Amendment rights of trespassers, the information Defendants had about the property, and other aspects of the building's appearance, it was objectively reasonable for Sessoms-Newton and Hegelson to believe that entering and taking photographs of the first-floor apartment unit and the common stairway, without a warrant, did not violate any clearly established law.

## V.     Plaintiff's Deprivation of Property Claim

Plaintiff also alleged that Defendants stole his camera and two cell phones from the first floor apartment. As Defendants have noted, "[d]eprivation of property by a state actor, whether intentional or negligent, does not give rise to a claim under § 1983 so long as the law of that state provides for an adequate post-deprivation remedy and the deprivation was the result of a 'random and unauthorized' act." *David v. N.Y.P.D. 42nd Precinct Warrant Squad*, No. 02–cv–2581, 2004 WL 1878777, at *5 (S.D.N.Y. Aug. 23, 2004) (collecting cases); *see also Davis v. N.Y.*, 311 F. App'x 397, 400 (2d Cir. 2009) (summary order) (quoting *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)). Here, Plaintiff has not claimed that any alleged deprivation of his property was authorized or the result of an established State procedure. Moreover, there exist adequate State post-deprivation remedies that Plaintiff could have used, such as, bringing a State law claim in the Court of Claims. *See Davis*, 311 F. App'x at 400; *Wahid v. Mogelnicki*, No. 15–cv–2869, 2017 WL 2198960, at *2 (E.D.N.Y. May 17, 2017) ("New York has adequate state post-deprivation remedies" that allow "a plaintiff [to] bring a state law claim for negligence, replevin or conversion with the Court of Claims"). Thus, Plaintiff's deprivation of property claim fails as a matter of law

and is dismissed. *See, e.g.*, *Wahid*, 2017 WL 2198960, at *2 (dismissing plaintiff's deprivation of property claim, given New York's adequate post-deprivation remedies and plaintiff's failure to indicate that the deprivation was authorized or the result of an established State procedure); *Alloul v. City of N.Y.*, No. 09–cv–7726, 2010 WL 5297215, at *6 (S.D.N.Y. Dec. 21, 2010) (dismissing plaintiff's deprivation of property interest claim based on the towing and subsequent destruction of plaintiff's car because "there [wa]s no evidence that either the towing or the destruction of [the] car was anything other than a 'random and unauthorized' act" and plaintiff failed to utilize a constitutionally adequate post-deprivation remedy, *i.e.*, pursue a State court action based on negligence or conversion).

## CONCLUSION

For the reasons set forth above, the Court grants summary judgment to Defendants on Plaintiff's unlawful entry claim and deprivation of property claim. The Clerk of Court is respectfully directed to enter judgment in Defendants' favor and terminate this action.

The Court certifies that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: August 17, 2017
      Brooklyn, New York